## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| JENNIFER M. SHOOK, | CASE NO. 1:24-CV-00336-CEF |
| Plaintiff, | JUDGE CHARLES E. FLEMING |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF SOCIAL SECURITY, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

### INTRODUCTION

Plaintiff Jennifer Shook challenges the Commissioner of Social Security's decision denying disability insurance benefits (DIB). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On February 23, 2024, under Local Civil Rule 72.2, this matter was referred to me to prepare a Report and Recommendation. (Non-document entry dated Feb. 23, 2024). Following review, and for the reasons stated below, I recommend the District Court **REVERSE** the Commissioner's decision and **REMAND** for additional proceedings.

### PROCEDURAL BACKGROUND

Ms. Shook applied for DIB in August 2021, alleging a disability-onset date of July 6, 2020. (Tr. 182). The claim was denied initially and on reconsideration. (*See* Tr. 66-75, 77-86). Ms. Shook then requested a hearing before an administrative law judge. (Tr. 107-08). Ms. Shook (represented by counsel) and a vocational expert (VE) testified before the ALJ on December 15, 2022. (Tr. 35-65). On January 13, 2023, the ALJ determined Ms. Shook was not disabled. (Tr. 15-34). On December 27, 2023, the Appeals Council denied Ms. Shook's request for review, making the

hearing decision the final decision of the Commissioner. (Tr. 1; *see* 20 C.F.R. § 404.981). Ms. Shook then timely filed this action on February 23, 2024. (ECF #1).

FACTUAL BACKGROUND

## I.      Personal and Vocational Evidence

Ms. Shook was 41 years old on the disability-onset date and 43 years old at the hearing. (*See* Tr. 182). She obtained a GED and previously worked in a factory as a CNC operator, assembler, and grinder. (Tr. 40-43). She also worked as a cashier at Dunkin' Donuts. (Tr. 42).

## II.      Relevant Medical Evidence

Ms. Shook has a long history of headaches and migraines following a left retrosigmoid craniotomy for resection of a cerebellopontine angle tumor[1] in 2006. (Tr. 354). Earliest available records show Ms. Shook established care with Tam McLean, M.D., on February 19, 2018, and explained her history of migraines following the craniotomy. (Tr. 573). She endorsed near daily headaches. (*Id.*). Dr. McLean prescribed venlafaxine for headache prevention and mood. (Tr. 575). On March 5, 2018, Dr. McLean switched Ms. Shook to citalopram because of side effects with venlafaxine and referred her to a neurologist for evaluation of her headaches. (Tr. 571). The neurologist prescribed Topamax, but it did not improve her headaches. (*See* Tr. 547). Propranolol and amitriptyline were also ineffective. (Tr. 543). By August 27, 2019, Ms. Shook reported having less stress and her headaches were controlled. (Tr. 532).

---

[1]      A cerebellopontine angle tumor, also known as a vestibular schwannoma or acoustic neuroma, is a brain tumor arising from Schwann cells that produces hearing loss, tinnitus, vestibular disturbances, nerve signals, and increased intracranial pressure. *Vestibular schwannoma* 801150, Stedman's Medical Dictionary.

2

On April 14, 2020, Ms. Shook returned to Dr. McLean's office for evaluation of upper respiratory symptoms and a mild headache. (Tr. 526).

On June 1, 2020, on a referral from Dr. McLean, Ms. Shook met with Nicholas Volchko, M.D., for a pain management appointment. (Tr. 354). She reported headache pain, rated as a 5 on a 10-point pain scale, and described pressure and throbbing over the craniotomy incision. (*Id.*). She also endorsed nausea, dizziness, and loss of balance. (*Id.*). Her pain is improved with tramadol and aggravated by bright lights and loud noises. (*Id.*). Dr. Volchko continued her prescriptions for tramadol and gabapentin. (Tr. 355).

Ms. Shook returned to Dr. Volchko's office on July 6, 2020, and endorsed pain (rated as a 3-to-5 on a 10-point scale) and pain reduction with tramadol. (Tr. 351). Physical examination was normal. (Tr. 352). Dr. Volchko continued her prescription for tramadol and stated he would research headache specialists and provide her with an appropriate referral. (*Id.*).

During her next appointment with Dr. Volchko on August 4, 2020, Ms. Shook reported tramadol is the only medication that helps reduce her headache pain to a "more tolerable level." (Tr. 348). She rated her pain between a 3 and 5 out of 10. (Tr. 349). Dr. Volchko refilled her prescription for tramadol and referred Ms. Shook to a headache specialist. (*Id.*).

Ms. Shook returned to Dr. Volchko's office on September 8, 2020, and reported left-sided neck pain (rated 8) and problems with imbalance. (Tr. 346). Dr. Volchko refilled tramadol and noted his intent to wean her off the medication. (Tr. 347). He refilled the prescription again on November 2, 2020, when Ms. Shook rated her pain as a 7 on a 10-point scale. (Tr. 342-43).

On November 11, 2020, Ms. Shook attended an appointment with Karen Steffey, APRN-CNP, for evaluation of her migraines. (Tr. 313). Ms. Shook completed a pre-treatment Migraine

Headache Questionnaire and reported 12 migraines and 30 headaches each month. (Tr. 307). She described her migraines as throbbing, pounding, aching, and pressured. (*Id.*). The migraines start at the back of her head and behind the left eye. (*Id.*). Associated symptoms include nausea, light, and noise sensitivity, feeling lightheaded, difficulty concentrating, vomiting, blurred vision, speech difficulty, and sparkling, flashing, or colored lights. (*Id.*). Her migraines are triggered or made worse by stress, certain foods, bright sunshine, loud noise, fatigue, weather changes, heavy lifting, certain smells and perfume, and coughing, straining, or bending over. (Tr. 308). Ms. Shook reported the pain ranges in intensity, from 2 to 8 on a 10-point scale. (Tr. 313). Physical examination was normal except she had tonic contracture in the trapezius, suboccipital, and paraspinous muscles and a decreased range of motion with cervical rotation. (Tr. 314-15). NP Steffey prescribed physical therapy to treat spasmodic torticollis, Zofran for nausea, and tizanidine, a muscle relaxant. (Tr. 315). For migraines, NP Steffey ordered a brain MRI and advised Ms. Shook to limit tramadol and NSAID usage each to two days per week to avoid rebound or medication overuse headaches. (*Id.*).

The brain MRI, dated December 3, 2020, was obtained to evaluate Ms. Shook's migraines. (Tr. 298). Findings included the following:

> There is postoperative deformity of the skull base in the midline and in the region of the left cerebellopontine angle. There is volume loss in the left side of the cerebellum with increased CSF signal in the left side of the posterior fossa. The CSF collection measures up to 6.8 cm in AP, 2 cm in transverse, and 3.4 cm in craniocaudal extent. There is flattening of the adjacent surface of the left cerebellar hemisphere but no midline shift. There is compensatory dilatation of the fourth ventricle.
>
> There is no enhancing pathology in the left cerebellopontine angle cistern. There is a linear signal abnormality traversing the right frontal lobe compatible with a tract where a catheter or shunt tube in place and subsequently removed. The

supratentorial brain parenchyma, brainstem, and cerebellum are otherwise unremarkable.

* * *

Impression: Stable appearance of the brain with postoperative changes consistent with resection of a left cerebellopontine angle cistern mass. There is atrophy of the left cerebellar hemisphere with compensatory dilatation of the fourth ventricle and a prominent area of CSF signal intensity occupying part of the left cerebellar hemisphere producing mild flattening of the adjacent cerebellar hemisphere producing mild flattening of the adjacent cerebellum area this may reflect an arachnoid cyst.

(Tr. 298-99).

Ms. Shook returned to NP Steffey on December 11, 2020, and endorsed daily, continuous migraines. (Tr. 317). She noted the intensity of her migraines varied between 3 and 8 on a 10-point scale. (*Id.*). She reported prior medications, including Topamax, Neurontin, Elavil, propranolol, Imitrex, Maxalt, Advil, and naproxen, did not help, but a prior Botox injection helped reduce the frequency and intensity of her migraines. (*Id.*). Physical examination was normal except she had tension in her trapezius, suboccipital, and paraspinous muscles and decreased range of motion in the cervical spine with rotation and lateral bending. (Tr. 318). For torticollis, NP Steffey encouraged Ms. Shook to begin physical therapy, continued her prescription for tizanidine, and prescribed ketorolac for pain. (*Id.*). NP Steffey also counseled Ms. Shook at length to decrease her use of tramadol to reduce her medication overuse headaches. (*Id.*). Ms. Shook received two intramuscular injections of Toradol for pain and was scheduled to return in six weeks for a Botox injection. (Tr. 319).

On January 25, 2021, Ms. Shook returned to Dr. Volchko's office and reported seeking insurance approval for Botox therapy. (Tr. 337). She also continued to report balance problems and rated her pain at 5. (Tr. 338). Dr. Volchko refilled her prescription for tramadol. (Tr. 339).

On April 28, 2021, Ms. Shook attended a pain management appointment with Nicholas Zielinski, PA-C, and complained of head pain, rated at 7 out of 10, and difficulty with imbalance and dizziness. (Tr. 602). PA Zielinski refilled her prescription for tramadol. (Tr. 603). On July 20, Ms. Shook received another refill of tramadol and was advised to make an appointment with her neurologist. (Tr. 600).

On August 14, 2021, Ms. Shook presented at the emergency department after a head injury. (Tr. 391). She reported her husband struck her head against the floor the day prior and rated her pain as 10. (Tr. 391, 397). Physical examination was normal except Ms. Shook endorsed pain with palpation of the left paraspinous musculature. (Tr. 403). A brain CT revealed findings similar to the December 2020 MRI and was negative for skull fracture or hemorrhage. (Tr. 405). She received intramuscular injections of ketorolac and was discharged in stable condition. (Tr. 406, 411).

On August 17, 2021, Ms. Shook followed up with Dr. McLean. (Tr. 436). She complained of persistent pain at the back of her head and mild nausea without vomiting, paresthesia, weakness, and imbalance. (*Id.*). Dr. McLean prescribed acetaminophen and ibuprofen to address "potential mild post-concussion syndrome," and a muscle relaxant for neck tightness. (Tr. 437).

Ms. Shook returned to Dr. McLean's office on August 26 for worsening head pain, rated at 7 on a 10-point scale. (Tr. 432-33). She reported using tramadol, but it did not help reduce her current headache and upper back pain. (Tr. 433). She also reported light and sound sensitivity. (*Id.*). Physical examination was normal except she endorsed left upper back tenderness to palpation. (*Id.*). Dr. McLean prescribed a steroid pack and Zofran for pain and nausea and administered a Toradol injection. (Tr. 434).

On October 20, 2021, Ms. Shook met with PA Zielinski and complained of sharp head pain, rated at 8, and more frequent migraines since the assault. (Tr. 595). She reported tramadol provides about 50 to 70 percent reduction in symptoms for four to eight hours. (*Id.*). Since separating from her husband, Ms. Shook reported that her sons were helping her complete activities of daily living. (*Id.*). PA Zielinski refilled her prescription for tramadol and advised Ms. Shook to meet with a neurologist for evaluation of her migraines. (Tr. 596).

On December 10, 2021, Ms. Shook met with Dr. McLean and complained of continued head pain, rated at 5. (Tr. 489). By then, she reported that tramadol, acetaminophen, and ibuprofen were not helpful for her migraines. (Tr. 490). A physical examination was normal except Ms. Shook had mild cervical spine tenderness and paracervical tenderness in the right shoulder. (*Id.*). Dr. McLean ordered a cervical X-ray and advised her to follow up with her neurologist and continue taking acetaminophen, ibuprofen, and a muscle relaxant. (Tr. 490-91).

On January 4, 2022, Ms. Shook attended a pain management appointment and complained of chronic headaches, nausea, intermittent balance deficits, speech issues, and confusion. (Tr. 590-91). She rated her pain at 8 out of 10. (Tr. 591). She admitted she did not complete a cervical X-ray that Dr. McLean ordered and did not schedule the recommended neurological consultation. (*Id.*). A physical examination was normal except mild tenderness in the paraspinal muscles and a mild limitation in neck range of motion testing. (*Id.*). PA Zielinski refilled Ms. Shook's prescription for tramadol and encouraged her to complete the cervical X-ray and schedule the neurological consultation. (Tr. 592).

On April 18, 2022, Ms. Shook met with PA Zielinski and complained of head and left-sided neck pain, rated at a 7 out of 10 and aggravated with rotation to the left. (Tr. 621). Physical

examination revealed similar clinical findings to her prior pain management appointment. (*Id.*). PA Zielinski ordered a cervical X-ray and refilled her tramadol prescription. (Tr. 622).

On August 2, 2022, Ms. Shook returned to PA Zielinski's office and complained of throbbing, aching head pain, and imbalance issues. (Tr. 692). Ms. Shook rated her pain at 10 on a 10-point scale and stated her pain was usually 5 but she did not take her medication that day. (Tr. 693). Her cervical X-ray was unremarkable. (Tr. 694). PA Zielinski again encouraged Ms. Shook to consult with a neurologist and refilled her prescription for tramadol. (*Id.*). PA Zielinski also discussed administering occipital blocks. (*Id.*).

On December 9, 2022, Ms. Shook returned to NP Steffey's office and complained of neck pain and daily migraines ranging in intensity from 3 to 8 on a 10-point scale. (Tr. 712). She endorsed pain reduction to 3 or 4 with tramadol. (*Id.*). Physical examination revealed tension in the trapezius, suboccipital, and cervical paraspinous muscles and decreased range of motion in the cervical spine with rotation and lateral bending. (Tr. 713). NP Steffey provided samples of Nurtec for migraines and refilled Ms. Shook's prescription for tizanidine. (*Id.*).

### III.  Medical Opinions

On November 4, 2021, state agency medical consultant Elaine Lewis, M.D., evaluated Ms. Shook's medical records in connection with her disability application. (Tr. 71-72). Based on Ms. Shook's chronic migraines and upper back pain, Dr. Lewis determined she could frequently balance and occasionally climb ladders, ropes, and scaffolds and crawl. (Tr. 71). In addition, Dr. Lewis opined Ms. Shook must avoid concentrated exposure to noise, vibration, fumes, odors, dusts, gases, and poor ventilation, and must avoid all exposure to hazards such as unprotected

heights and machinery. (Tr. 72). On May 17, 2022, state agency medical consultant Scott W. Bolz, M.D., reviewed updated medical records and adopted Dr. Lewis's assessment. (Tr. 83).

On December 14, 2022, NP Steffey stated Ms. Shook has daily migraines and associated symptoms including nausea and vomiting, photosensitivity, inability to concentrate, exhaustion, and mood changes. (Tr. 716). Noting that she met with Ms. Shook just twice in 2020 and once in 2022, NP Steffey did not assess Ms. Shook's residual functional capacity. (Tr. 716-18).

## IV.     Relevant Testimonial Evidence

Ms. Shook cannot work because of headaches and migraines. (*See* Tr. 46). She testified leaving her most recent job in July 2020 because the lights and noise of the machines triggered her head pain. (Tr. 44, 46). Before she stopped working, Ms. Shook often called out and left early. (*Id.*). Ms. Shook explained she has a constant headache, described variously as dull, sharp, and numb, that does not go away. (Tr. 47). Her baseline pain begins at 5 on a 10-point scale and can increase in severity or turn into a migraine. (*Id.*). Ms. Shook gets migraines about once a week and treats them with daily medication, heating packs, increased water intake, and rest in a dark, quiet room. (Tr. 48). With those treatments, migraines last about a half-hour to an hour. (Tr. 48-49). She receives tramadol through pain management and uses it daily. (Tr. 49). During her most recent neurology appointment Ms. Shook received a muscle relaxer to take at night to reduce her head and neck pain. (Tr. 50). Since Ms. Shook's brain surgery, she has experienced imbalance issues, and although she has not fallen, she stumbles and bumps into things when walking, as if she had been drinking. (Tr. 54-55). She also experiences bouts of nausea without vomiting. (Tr. 55). Ms. Shook has memory issues and writes everything down. (Tr. 57-58).

At home, Ms. Shook lives with her two boys, ages 10 and 14, and her husband. (Tr. 52). Her 10-year-old son is autistic. (*Id.*). When her 14-year-old son is not in school, he helps Ms. Shook care for the younger son by handling meltdowns and feeding him. (*Id.*). Ms. Shook's husband otherwise takes care of household tasks. (*Id.*).

In August 2021, Ms. Shook was the victim of assault. (Tr. 52-53). She then experienced worsening neck pain, tightness, and a cracking sensation. (Tr. 53). Her headaches remained the same. (Tr. 54).

The VE identified Ms. Shook's past relevant work as a machine operator, automatic coil winder machine operator, grinder, and fast-food worker cashier. (Tr. 60-61). The VE testified that a person of Ms. Shook's age, education, and work experience, with the functional limitations described in the ALJ's RFC determination, could not perform past relevant work but could perform work as a merchandise marker, routing clerk, and mail clerk. (Tr. 62). The VE stated employers do not tolerate off-task time beyond typical breaks (two 15-minute breaks, a 30-minute lunch break, and occasional bathroom breaks) and tolerate no more than one absence per month. (Tr. 63-64).

At the end of the hearing, Ms. Shook's attorney representative argued her migraines equal Listing 11.02, as informed by Social Security Ruling (SSR) 19-4p. (Tr. 64-65).

## V.      Other Relevant Evidence

Ms. Shook completed an Adult Function Report describing how her migraines and headaches limit her activities. (Tr. 236-43). There, she reported that her oldest son helps her prepare meals and do household chores because she cannot stand for long. (Tr. 238). She shops for groceries once a week. (Tr. 239). Ms. Shook regularly attends medical appointments and her

children's school activities. (Tr. 240). Her migraines and dizziness affect her ability to lift, bend, stand, reach, kneel, see, remember, concentrate, understand, and follow directions. (Tr. 241).

### STANDARD FOR DISABILITY

Eligibility for benefits depends on the existence of a disability. 42 U.S.C. § 423(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. § 1382c(a)(3)(A).

The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520— to determine whether a claimant is disabled:

1.  Was claimant engaged in a substantial gainful activity?

2.  Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.  Does the severe impairment meet one of the listed impairments?

4.  What is claimant's residual functional capacity and can claimant perform past relevant work?

5.  Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity (RFC) to perform available work in the national economy. *Id.* The ALJ considers the claimant's RFC, age, education, and past work experience to determine whether the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including

inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

## THE ALJ'S DECISION

At Step One, the ALJ determined Ms. Shook had not engaged in substantial gainful activity since July 6, 2020, the alleged onset date. (Tr. 20). At Step Two, the ALJ identified Ms. Shook's severe impairments as follows: depressive disorder with anxiety, generalized anxiety disorder, migraine disorder with history of benign schwannoma removal in 2006, neuropathy, and torticollis. (*Id.*). At Step Three, the ALJ found Ms. Shook's impairments did not meet the requirements of, or were medically equivalent to, a listed impairment. (Tr. 21-23).

At Step Four, the ALJ determined Ms. Shook's RFC as follows:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant can frequently balance. The claimant can occasionally climb ladders, ropes, or scaffolds. The claimant can occasionally crawl. The claimant can frequently be exposed to vibrations and fumes. The claimant can never be exposed to unprotected heights, dangerous moving mechanical parts, and commercial motor vehicles. The claimant can be exposed to a moderate amount of noise. And by moderate, the undersigned means business offices where typewriters are used, department stores, grocery stores, light traffic, and fast-food restaurants off-hours. The claimant is able to carry out, concentrate, persist, and maintain pace for completing simple, routine, repetitive tasks. The claimant can occasionally and superficially interact with supervisors, coworkers, and the public. Superficial interaction is defined as work that does not involve any work tasks such as arbitration, negotiation, confrontation, being responsible for safety of others, or directing work of others. The claimant can work in a non-public setting. The claimant can use judgment to make simple work-related decisions. The claimant can tolerate occasional changes.

(Tr. 23-25). The ALJ then found Ms. Shook cannot perform her past relevant work (Tr. 29). At Step Five, the ALJ determined jobs exist in significant numbers in the national economy that Ms.

Shook can perform, including marker, routine clerk, and mail clerk. (Tr. 30). Therefore, the ALJ found Ms. Shook was not disabled. (*Id.*).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters*, 127 F.3d at 528. The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "Substantial evidence" is "more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). But "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 F.App'x 636, 641 (6th Cir. 2013) (cleaned up).

In determining whether substantial evidence supports the Commissioner's findings, the court does not review the evidence de novo, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence (or indeed a preponderance of the evidence) supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is

a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

Along with considering whether substantial evidence supports the Commissioner's decision, the court must determine whether proper legal standards were applied. The failure to apply correct legal standards is grounds for reversal. Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own regulations and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004).

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted); *accord Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked.")

## DISCUSSION

Ms. Shook claims the ALJ erred at Step Three of the sequential analysis. She argues the ALJ did not apply the correct standards in determining whether her migraines medically equaled Listing 11.02B and the determination is not supported by substantial evidence. (ECF #8 at PageID 746). Several regulations and Social Security Rulings (SSR) guide my analysis.

At Step Three, a claimant will be found disabled if her impairment meets or equals one of the listings in the Listing of Impairments. 20 C.F.R. § 404.1520(a)(4)(iii); *Turner v. Comm'r of Soc.*

*Sec.*, 381 F.App'x. 488, 491 (6th Cir. 2010). The Listing of Impairments in Subpart P, Appendix 1 of the regulations describes impairments the SSA considers to be "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. § 404.1525(a). Thus, a claimant who meets or medically equals a listing is deemed conclusively disabled and entitled to benefits.

When considering whether a claimant's impairment meets or equals a listed impairment, an ALJ must evaluate the evidence, compare it to the relevant listed impairment, and give an explained conclusion to facilitate meaningful judicial review, without which is it impossible to say that the ALJ's decision at Step Three is supported by substantial evidence. *Reynolds v. Comm'r of Soc. Sec.*, 424 F.A'ppx. 411, 416 (6th Cir. 2011). To meet a listing, the claimant must satisfy all required criteria. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009). The claimant's condition medically equals a listing if it is "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 404.1526(a). An ALJ can find medical equivalence in three ways, only one of which is relevant here. If the claimant's impairment is not described in the Listings, the ALJ will compare the findings with those for closely analogous listed impairments and, if the findings are at least of equal medical significance to those of a listed impairment, the ALJ will find the claimant's condition is medically equivalent to the listing. *Id.*, at § 404.1526(b)(2). The ALJ's medical equivalence determination is based on all evidence about the claimant's impairment, including symptoms and its effects. *Id.*, at § 404.1526(c).

SSR 17-2p explains how ALJs make findings about medical equivalence. *See* 2017 WL 3928306 (Mar. 27, 2017). The ALJ's decision about whether the claimant's impairment medically

15

equals a listing must be based on the preponderance of evidence in the record. *Id.* at *3. A finding

of disability based on medical equivalence at Step Three must be based on one of the following:

1. A prior administrative medical finding from a medical or psychological consultant from the initial or reconsideration adjudication levels supporting the medical equivalence finding.

2. Medical expert evidence, which may include testimony or written response to interrogatories, obtained at the hearings level supporting the medical equivalence finding.

3. A report from the Appeals Council's medical support staff supporting the medical equivalence finding.

*Id.*

Whether a claimant's impairment medically equals a listed impairment is a decision

reserved for the ALJ. 20 C.F.R. § 404.1526(e)(3). Therefore, when the ALJ engages a medical

expert and the expert states the claimant's impairment medically equals a listed impairment, the

ALJ must ask the expert to identify medical evidence in the record that supports the expert's

conclusion. SSR 17-2p at *4. If the ALJ believes the impairment is medically equivalent to a listed

impairment, the ALJ must articulate how the record established medical equivalence using one of

the three methods in § 404.1526 and provide a reasonable rationale sufficient for a subsequent

reviewer or the court to understand the decision. *Id.* Generally, a statement that the claimant's

impairment does not medically equal a listed impairment is sufficient articulation for the finding,

but the adjudicator's articulation for why the individual is not disabled at a later step in the

disability evaluation must provide a rationale sufficient for a subsequent reviewer to determine the

basis for the finding of medical equivalence at Step Three. *Id; see also Forrest v. Comm'r of Soc. Sec.,*

591 F.App'x. 359, 366 (6th Cir. 2014) (looking to factual findings elsewhere in the ALJ's decision

to affirm the medical equivalency determination at Step Three). If the decision as a whole does not

16

provide sufficient rationale, the ALJ's error is harmless unless the claimant raised a "substantial question" as to whether he satisfied a listing. *See Reynolds,* 424 F.App'x at 416. To raise a substantial question, the claimant must point to specific evidence demonstrating she reasonably could meet or equal every requirement of the listing. *Smith-Johnson v. Comm'r of Soc. Sec.,* 579 F.App'x 426, 432 (6th Cir. 2014); *see also Sullivan v. Zebley,* 493 U.S. 521, 531 (1990).

SSR 19-4p guides the analysis when the impairment is primary headache disorder. SSR 19-4p, 2019 WL 4169635 (Aug. 26, 2019). It instructs that "[p]rimary headache disorders are a collection of chronic headaches illnesses characterized by repeated exacerbations of overactivity or dysfunction of pain-sensitive structures in the head," and examples of which include "migraines, tension-type headaches, and trigeminal autonomic cephalalgias." *Id.* at *3. They are typically severe enough to require prescribed medication. *Id.* "Migraines are vascular headaches involving throbbing and pulsating pain caused by the activation of nerve fibers that reside within the wall of brain blood vessels traveling within the meninges." *Id.* Migraine without aura is accompanied by nausea, vomiting, or photophobia or phonophobia. *Id.*

A primary headache disorder is diagnosed after reviewing a person's full medical and headache history and conducting a physical and neurological examinations. *Id.* at *4. Although MRIs may be useful in excluding other possible causes of headache symptoms, an unremarkable MRI is consistent with a primary headache diagnosis. *Id.* The International Classification of Headache Disorders (ICHD-3) sets forth the diagnostic criteria for migraine without aura: (1) headache lasting 4 to 72 hours (untreated or unsuccessfully treated); (2) two of four characteristics including unilateral location, pulsating quality, moderate, or severe pain intensity, or aggravation by or causing avoidance of routine physical activity; and (3) during the headache, the claimant has

17

nausea, vomiting, photophobia, or phonophobia. *Id.* at *5. While primary headache disorder is not a listed impairment, it may medically equal Listing 11.02 (Epilepsy), the most closely analogous listed impairment. *Id.* at *7. If the claimant exhibits equivalent signs and limitations to those detailed in Listing 11.02B or 11.02D for dyscognitive seizures, the ALJ may find the impairment medically equals the listing:

> Paragraph B of listing 11.02 requires dyscognitive seizures occurring at least once a week for at least 3 consecutive months despite adherence to prescribed treatment. To evaluate whether a primary headache disorder is equal in severity and duration to the criteria in 11.02B, [the ALJ] consider[s]: A detailed description from an [accepted medical source] of a typical headache event, including all associated phenomena (for example premonitory symptoms, aura, duration, intensity, and accompanying symptoms); the frequency of headache events; adherence to prescribed treatment; side effects of treatment (for example, many medications used for treating a primary headache disorder can produce drowsiness, confusion, or inattention); and limitations in functioning that may be associated with the primary headache disorder or effects of its treatment, such as interference with activity during the day (for example, the need for a darkened and quiet room, having to lie down without moving, a sleep disturbance that affects daytime activities, or other related needs and limitations).

*Id.* Most of the listed requirements are based on a claimant's reports to her treating providers.

The record contains evidence pertinent to the evaluation. NP Steffey memorialized a typical headache event as throbbing, pounding, aching, and pressure at the back of her head bilaterally and behind the left eye with associated symptoms including nausea, light, and noise sensitivity, lightheadedness, difficulty concentrating, vomiting, blurred vision, speech difficulty, and flashing lights. (Tr. 307). She also described pressure and throbbing over the craniotomy incision. (Tr. 354). Triggers and aggravating factors include stress, certain foods and odors, bright lights, loud noise, fatigue, heavy lifting, changes in the weather, coughing, straining, and bending over. (Tr. 308).

The record reflects Ms. Shook made multiple statements about the frequency of her headaches. In November 2020, she reported 12 migraine-days and 30 headache-days a month. (Tr. 307). In December 2020, she endorsed daily continuous pain. (Tr. 317). In August 2021, she complained of persistent head pain. (Tr. 436). In December 2022, she reported daily head pain. (Tr. 712). At the hearing, Ms. Shook said she had migraines at least once a week. (Tr. 48).

Ms. Shook consistently reported tramadol is the only medication that reduces her headache pain. (Tr. 351, 348). The medication takes about a half-hour to an hour to activate, requiring Ms. Shook to lie down in a dark room with a heating pad. (Tr. 48-49, 595). Once activated, tramadol provides 50 to 70% pain reduction for 4 to 8 hours. (Tr. 595). She is prescribed a 50mg dose of tramadol to be taken up to three times a day as needed (*see, e.g.*, Tr. 489), but she was counseled to limit usage to two times a week to avoid medication overuse headaches (Tr. 315, 317). The other prescribed medications intended to reduce migraines and head pain were not effective, including Topamax, Neurontin, Elavil, propranolol, Imitrex, Maxalt, and naproxen. (Tr. 317, 543, 547). Ms. Shook also noted her sons help her complete activities of daily living, meal preparation, and household chores. (Tr. 238, 595).

At Step Three, the ALJ determined Ms. Shook does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. (Tr. 21). She evaluated the impairment as follows:

> By analogy, and pursuant to Social Security Ruling 19-4p, the undersigned has considered this Listing, subparts B and D, with respect to the claimant's headache disorder. The record does not support that the claimant has symptoms similar to those present with dyscognitive seizures, occurring at least once a week for at least 3 consecutive months despite adherence to prescribed treatment, necessary to satisfy Listing 11.02B. As to Listing 11.02D, the record does not support that the claimant has experienced dyscognitive seizures, occurring at least once every two weeks for at least 3 consecutive months despite adherence to prescribed treatment; and a marked

limitation in one of the following: (1) physical functioning; (2) understanding, remembering, or applying information; (3) interacting with others; (4) concentrating, persisting, or maintaining pace; or adapting or managing oneself. The record does not support a frequency of migraine/headache activity and extent of symptoms, by analogy, that equates to that of the frequency and severity of seizure activity required for any of the subparts of this Listing. Moreover, the claimant does not have a marked limitation in physical functioning, as demonstrated by the above-referenced physical examination findings.

(*Id.*). In a footnote, the ALJ noted dyscognitive seizures are characterized by alteration of consciousness without convulsions or loss of muscle control. (*Id.*).

The ALJ's evaluation at Step Three does not satisfy the requirement that she evaluate the evidence, compare that evidence with the listing, and give an explained conclusion to facilitate meaningful judicial review. *See Reynolds*, 424 F.App'x at 416. Indeed, it lacks all components of the analysis. Consistent with the guidance under SSR 19-4p, a review of the relevant evidence (including duration, intensity, and accompanying symptoms; frequency; adherence to treatment; and limitations associated with the disorder) shows Ms. Shook might medically equal the Listing. For years, Ms. Shook frequently complained of and received treatment for daily and weekly head pain and migraines. She testified to daily head pain and migraines occurring at least once a week. If Ms. Shook has daily or even weekly migraines, then she could have experienced one a week for three months, satisfying the frequency requisite under Listing 11.02B. Ms. Shook receives Zofran to treat associated nausea. (Tr. 315, 434). The ALJ noted Ms. Shook reported that tramadol reduced her pain. (Tr. 25). Ms. Shook testified that tramadol takes a half-hour to an hour to have an effect; until then, she must lie in a dark, quiet room with a heating pad until the pain subsides to a tolerable level. (Tr. 48). If Ms. Shook's pain is reduced but not eliminated, then she may also satisfy Listing 11.02B's requirement that migraines occur despite adherence to prescribed treatment.

20

I conclude the ALJ erred at Step Three when she failed to evaluate the relevant evidence, compare that evidence with Listing 11.02B, and provide an explained conclusion about medical equivalence. If the ALJ's evaluation at a later step in the analysis does not provide rationale sufficient for the court to determine the basis for her medical equivalency finding, the court cannot meaningfully review the decision for substantial evidence.

In her summary of the medical record, the ALJ acknowledged Ms. Shook's prior surgical history and updated brain imaging showing no evidence of residual or recurring tumor and no acute processes or significant interval changes. (Tr. 25). Then, the ALJ summarized medical appointments with NP Steffey and Dr. Volchko, noting Ms. Shook's pain improved with medication and physical examinations were largely normal except contracture and tension in trapezius, suboccipital, and paraspinous muscles and associated decreased cervical range of motion. (*Id.*). The ALJ also listed Ms. Shook's reported migraine triggers. (*Id.*). Next, the ALJ noted the infrequency with which Ms. Shook reported balance deficits to her medical providers and that physical examinations were unremarkable. (Tr. 25-26). The ALJ also summarized Ms. Shook's emergency department visit and follow-up care before stating that progress notes from her December 2022 appointment with NP Steffey "did not demonstrate that she was in significant distress from these symptoms." (Tr. 26).

After summarizing the medical record, the ALJ offered these reasons for finding Ms. Shook not disabled:

> As a whole, the objective evidence is not fully consistent with the claimant's allegations of disabling pain, imbalance, and mobility limitations. Physical examinations and diagnostic imaging were relatively unremarkable, with MRI essentially unchanged from a study in 2016 when she was still working. The claimant alleged her headaches are longitudinal in nature, since her 2006 tumor removal surgery, but she worked for a number of years after that time without any clear

evidence of worsening of those symptoms established in the record at or around the time of the alleged onset date. The claimant is capable of carrying out household and parenting responsibilities on a regular basis. The progress notes do not reflect the degree and severity of the symptoms currently alleged at the hearing. While the claimant's headache disorder and neck pain would reasonably preclude strenuous postural maneuvers or certain environmental exposures, the evidence fails to demonstrate persistent pain or other symptoms that would preclude her ability to move about and to perform all fulltime work, with the appropriate restrictions as above.

* * *

The undersigned reviewed the headache questionnaire completed by Karen Steffey, APRN, on December 14, 2022, but this checklist did not contain any specific limitations regarding the claimant's ability to carry out work activity. Nurse Steffey noted the claimant had followed up inconsistently and she was unable to comment on most aspects of the questionnaire due to lack of information.

Therefore, considering the medical evidence and medical opinions discussed above, the undersigned finds that the claimant's subjective complaints and alleged limitations were not fully consistent with the substantial weight of the evidence, and that [s]he retained the ability to perform a range of activities at all exertional levels, with postural, environmental, and mental limitations as set forth in the residual functional capacity.

(Tr. 26, 28-29).

The ALJ's post-Step Three analysis explains the basis for her medical equivalency finding. Evaluating whether a primary headache disorder medically equals Listing 11.02 requires the ALJ to consider a claimant's subjective statements to her treating providers about characteristics of typical headaches, frequency, associated symptoms, medication side effects, and limitations stemming from her disorder. The ALJ relied on the "relatively unremarkable" brain imaging and physical examinations, Ms. Shook's demonstrated ability to work for years after the brain surgery, and her ability to carry out household and parenting responsibilities regularly to conclude Ms. Shook can perform work. The ALJ then declared Ms. Shook's subjective complaints and alleged limitations

not fully consistent with the evidence because she did not attend follow-up appointments with one of her providers consistently.

In evaluating the claimant's subjective reports of symptoms, SSR 16-3p provides that an ALJ must consider the claimant's complaints along with the objective medical evidence, treatment received, daily activities, and other evidence. 2017 WL 5180304, at *5-8 (Oct. 25, 2017). If it is reasonable for the ALJ to discount Ms. Shook's subjective statements about her symptoms and limitations, then the ALJ could reasonably assert Ms. Shook's primary headache disorder did not medically equal the criteria of 11.02. In that case, the ALJ's terse Step Three analysis would not be a basis for remand.

But the ALJ made several errors in her symptom evaluation that preclude me from finding the decision is supported by substantial evidence or that the ALJ applied the correct legal standards. First, unremarkable brain imaging is not highly relevant in the context of a primary headache disorder. SSR 19-4p teaches that unremarkable brain imaging is, indeed, consistent with a primary headache disorder diagnosis. SSR 19-4p, at *4; *see also* SSR 16-3p, at *11 (ALJ's must limit their evaluation of the individual's statements about her symptoms and the evidence in the record that is relevant to the individual's impairments). Next, the ALJ mischaracterized the available evidence about Ms. Shook's ability to carry out daily activities. At the hearing and during medical appointments, Ms. Shook described limitations in her activities, including that her oldest son helps her prepare meals and do household chores, helps care for his younger brother, and does all the yard work. (Tr. 52, 238, 478, 595). During a psychological consultation, Joseph Konieczny, Ph.D., memorialized Ms. Shook's described daily activities thusly:

> Jennifer typically gets up at 6:30am, attends to her morning hygiene, and gets dressed. She will help her children prepare for school. She occasionally eats breakfast. She

> spends her morning time watching television. She will occasionally attend
> appointments. Following lunch, she will engage in household chores and interact
> with her children after they return home from school. Following supper, she will
> interact with her children before retiring at 10pm. Jennifer is minimally involved in
> outside social activities.

(Tr. 478). The minimal activities Ms. Shook described are hardly consistent with eight hours'

worth of typical work activities. *See Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248-49 (6th Cir.

2007) (finding that the claimant's daily functions, including her ability to drive, clean her

apartment, care for two dogs, do laundry, read, do stretching exercises, and watch the news, were

not "comparable to typical work activities" and did not justify the ALJ's discrediting claimant's

testimony). In light of the available evidence of record, the ALJ's determination that Ms. Shook

can carry out household and parenting responsibilities regularly is not supported by substantial

evidence and does not justify discounting Ms. Shook's statements about her symptoms and

limitations.

Finally, it appears the ALJ inappropriately discounted Ms. Shook's statements because she

did not consistently follow up with one of her treating providers. To be sure, an ALJ is entitled to

find a claimant's symptoms are inconsistent with the overall evidence of record if the claimant

does not seek treatment comparable with the degree of her subjective complaints. SSR 16-3p, at *9.

But an ALJ "will not find an individual's symptoms inconsistent with the evidence in the record

on this basis without considering possible reasons he or she may not comply with treatment or

seek treatment consistent with the degree of his or her complaints." *Id.* At the administrative

proceeding, the ALJ did not ask why Ms. Shook did not seek treatment in a manner consistent

with her complaints. Equally inappropriate is the ALJ's failure to go beyond her single, conclusory

statement that Ms. Shook's "subjective complaints and alleged limitations were not fully consistent

with the substantial weight of the evidence." The determination or decision "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated" so that subsequent reviewers can assess how the ALJ evaluated the individual's symptoms. SSR 16-3p, at *10.

In sum, the ALJ's conclusion that Ms. Shook's statements were inconsistent with other evidence of record is not supported by substantial evidence. Because substantial evidence does not support the ALJ's evaluation of Ms. Shook's symptoms, the ALJ's determination of medical equivalence under Listing 11.02, which itself requires an evaluation of the claimant's reported statements about her symptoms, is also deficient, leaving the Court with no way to review the ALJ's Step-Three finding.

Because the ALJ's decision as a whole does not provide sufficient rationale for the ALJ's Step-Three determination and the record contains evidence that shows Ms. Shook could medically equal Listing 11.02, the error is not harmless. *See Reynolds,* 424 F.App'x at 416. As a result, I recommend the District Court remand the matter for additional proceedings. In light of the guidance under SSR 17-2p, it would not be appropriate to require the ALJ to obtain medical expert testimony on the question of medical equivalence, but because the evidence shows Ms. Shook's migraines might medically equal Listing 11.02B, the ALJ should strongly consider obtaining an expert opinion on the matter.

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, I recommend that the District Court **REVERSE** the Commissioner's decision denying disability insurance benefits and **REMAND** for additional proceedings.

Dated: October 31, 2024

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

OBJECTIONS, REVIEW, AND APPEAL

Within 14 days after being served with a copy of this Report and
Recommendation, a party may serve and file specific written objections to the
proposed findings and recommendations of the Magistrate Judge. *See* Fed. R.
Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly
asserted objections shall be reviewed de novo by the assigned district judge.
Failure to file objections within the specified time may result in the forfeiture or
waiver of the right to raise the issue on appeal, either to the district judge or in a
subsequent appeal to the United States Court of Appeals, depending on how or
whether the party responds to the Report and Recommendation. *Berkshire v.
Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not
merely indicate a general objection to the entirety of the Report and
Recommendation; "a general objection has the same effect as would a failure to
object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir.
1991). Objections should focus on specific concerns and not merely restate the
arguments in briefs submitted to the Magistrate Judge. "A reexamination of the
exact same argument that was presented to the Magistrate Judge without specific
objections 'wastes judicial resources rather than saving them and runs contrary to
the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186,
2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at
509). The failure to assert specific objections may in rare cases be excused in the
interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th
Cir. 2019).